Hear ye, hear ye, hear ye. United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning. This is Robin Rosenbaum and along with me on the panel today we have judges Jill Pryor and Elizabeth Branch. Welcome to the 11th Circuit Court of Appeals. I have to say this is the first time that this specific panel will be holding oral argument by telephone so we will have to make adjustments as we go along if we find that there are any glitches and I apologize in advance if that occurs but I'm sure we can all work together and make it through this successfully. I just wanted to identify a few rules before we start. Some will be usual and some maybe less so because of the circumstances. First, of course, we will abide by the usual timing requirements except where we have otherwise allowed or authorized additional time and the courtroom deputy will make announcements two minutes before time runs and at the end of time. We would ask that all lawyers please abide by the time frame unless somebody on the panel asks you a question in which case, of course, please answer the question fully and to your ability because we wouldn't be asking it if we didn't want to know the answers. Second, please identify yourselves and the parties that you represent before you begin your argument or your rebuttal and I think that probably should start us on our way. We will try to identify ourselves to the extent possible when we ask questions. All right. With that, we will go ahead and start with United States of America versus Julio Estrada and Bartolo Hernandez. Mr. Srebnick, will you be beginning or will we hear from Mr. Marcus first? Good morning, Your Honor. This is Howard Srebnick. I will be delivering the initial remarks for 11 minutes. Mr. Marcus will then follow me for 11 minutes. We've each reserved four minutes for rebuttal. All right. That's fine. Thank you. And good morning again. Howard Srebnick here on behalf of Julio Estrada. I will be addressing the challenges to the government's theory of prosecution. Because this case, the Estrada-Hernandez case, presents a fact pattern not before addressed by the 11th Circuit where defendants have been convicted under the current version of Title VIII United States Code 1324A2 for allegedly bringing asylum-seeking Cubans directly to a designated port of entry, not circumventing the designated port of entry, where those defendants did not themselves nor did anyone acting at their direction physically accompany or physically transport the aliens to the United States, but instead the aliens themselves, under their own power, approached designated ports of entry, two of them at the land border in Mexico, two of them at Miami International Airport, a designated port of entry. We submit that the convictions under 1324A2 for bringing aliens lacking prior official authorization, those convictions must be reversed because the government proceeded under a flawed theory of prosecution. At a minimum, a new trial is required because the district court declined to give the defense requested jury instructions which would have required a specific factual finding by the jury that the aliens lacked prior official authorization. Instead, the district court, in a pretrial order, precluded any evidence or any argument about the Cuban Adjustment Act, about the wet foot, dry foot policies, about any executive proclamations that would have led a jury to conclude that indeed, asylum-seeking Cubans do have prior official authorization. The jury instruction that the court gave eliminated any consideration by the jury of that factual question. The court can find the jury instructions proposed by the defense at Docket Entry 310, page 28. Ms. Remnick, this is Jill Pryor. I have a question for you. Are the two grounds on which you distinguish Dominguez, one, that here they came directly to a port of entry, and second, that the defendants didn't physically accompany them across the border. Is there anything else? No, those are the primary distinctions between Dominguez and the Estrada case. That is correct, Your Honor. And tell me what the significance of those two things is. Well, in Dominguez, the aliens were not transported to a port of entry. The aliens landed in the United States, remained in the United States for several months before applying for asylum. That is a significant distinction because our executive branch, as recently as 2018, has invited aliens to seek asylum at a port of entry. At page 66 of 69 of our brief, the initial brief, we quoted indeed the Trump administration encouraging migrants to seek asylum at bridges. Quote, you are not breaking the law by seeking asylum at a port of entry. That's a direct quote from the Secretary of Homeland Security in 2018. We view that invitation by the executive branch as authorizing aliens to approach a designated port of entry and seek asylum there. What makes it illegal is for the alien to circumvent the port of entry or for a defendant to smuggle an alien into the United States at a place other than a designated point of entry. So is it your position, Mr. Shrednick, is it your position then that it doesn't matter what else the defendants did as long as the aliens came to a port of entry and they basically walked across or came across the border by themselves? Yes, Your Honor. All of the activity that precedes the approach to the designated port of entry, all of the efforts to extract the Cuban aliens out of Cuba, to house them in Haiti or house them in Mexico, all of that does not rise to the level of bringing the alien to the United States. The essential element to convict a defendant of bringing the alien to the United States requires, as the Fifth Circuit has held in Garcia-Paulin, as the D.C. District Court held in the Asadi case, some accompaniment, some escorting to the United States. And I thought of this example last night and perhaps it can illustrate. If I were to tell the court I'm going to bring my grandmother to the doctor this afternoon and the court later found out that what I did was I gave my grandmother cat fare to take herself to the doctor, I think everyone would question my representation that I was bringing my grandmother to the doctor. Everything that precedes my giving her, financing her trip to the doctor, all of that, what precedes it, does not suffice if I am not the one bringing her to the doctor, no different than the Cuban aliens who, under their own power, walked across the bridge at the land border in Mexico. Mr. Sherman, this is Robin Rosenbaum. Let me ask you this, though. What about the aiding and abetting theory? I mean, if your clients are found to, which they were, I guess, found to have aided and abetted the entry of these aliens or the bringing of these aliens into the United States, why isn't that sufficient under aiding and abetting theory? Aiding and abetting requires there be a principle and an aider and abetter of the actual bringing so that the defendant doesn't aid and abet the alien. The defendant would have to aid and abet someone who escorted the alien to the port of entry into the United States. Here, the aliens, by undisputed fact, the alien at the Mexican border, Omar Luis, walked by himself across the border, presented himself to CBP to seek asylum in the United States. Two of the aliens were in Haiti, in a hosta and a breu. They boarded a commercial airline unaccompanied by any co-conspirator. There was no principle, no aider and abetter who accompanied the two baseball players from Haiti to the port of entry at Miami International Airport. And so the absence of the physical accompaniment, according to the Fifth Circuit, according to the D.C. District Court, dooms a conviction for bring-to. I must admit that if these defendants had been charged under the statute penalizing, encouraging, or inducing an alien to go to the United States, the government would have a much stronger case. But the government elected to proceed under the bring-to statute, which carries higher penalties, and because the government chose that statute, they had an extra level of proof they needed to meet, which, on this record, they did not meet. I hope that answers your question, Judge Rosenbaum. Now, our argument would have the court reverse the convictions and remand for the entry of a judgment of acquittal based on this failure of theory of the government under the bring-to element. Likewise, the District Court's exclusion of the executive branch policies, which invite asylum-seeking aliens to go directly to a port of entry, would likewise require reversing the convictions and entry of a judgment of acquittal. And our fallback position…  Yes, Your Honor. …at a port of entry, whether they are invited by an administration or not, how does that change the fact that they actually don't have official authorization and they have to go through the process? They have to present themselves at the border, and there are still ways that they can be declined. If the alien has a criminal conviction, they still have to be processed and paroled into the country. So how do you get around what Dominguez has set up as sort of the framework for that and how the actual entry process works? I understand I have two minutes. Thank you, Stephanie. So since Dominguez addressed solely aliens who did not arrive at a port of entry, who circumvented that process, the case is distinguishable on that basis. But a more direct answer to your question, the Cuban Adjustment Act makes it a foregone conclusion that a Cuban who presents himself at a designated port of entry will be granted asylum as a matter of executive policy. And that is an invitation to Cubans to present themselves at the port of entry, which is exactly what these Cuban aliens did. Now, the President of the United States has virtually unbridled authority to control the decision of who is welcome to come into our country. As recently as two years ago, the Supreme Court in the Trump v. Hawaii case wrote this at Head Notes 25 and 26. Quote, for more than a century, this court has recognized that the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the government's political departments, largely immune from judicial control. To the extent that the executive branch authorizes a particular subset of aliens to seek asylum through some priority basis, as has been the practice with Cubans up through the wet foot, dry foot policy, we believe a jury, not a judge, should have been allowed to make the decision whether these Cuban aliens had prior official authorization. By directing the verdict, as the district court's instructions did, violated our client's rights. I'd like to reserve the balance of my time for rebuttal. Thank you, Mr. Srebnik. Mr. Marcus. Good morning, and may it please the court, this is Jeff Marcus, and I represent Mr. Hernandez. I wanted to start addressing count two, which is the substantive bringing count against Mr. Hernandez. And then, time permitting, I will address some of the issues with respect to the conspiracy count. Now, the bringing count, as this court is aware, as we've briefed with Section 1324, there are different statutes and offenses at play. Bringing two, though, as opposed to transporting within the United States or harboring those within the United States, or even encouraging or inducing, deals largely with extraterritorial conduct, conduct outside the United States, involved in bringing someone to the United States. And the issue here, again, with the entry in our count, we're talking about a flyer, Leonis Martin, who proceeded, who was trading in Mexico for months, and then proceeded on the land bridge in Mexico to the entry point at Laredo, Texas, and presented himself. Our client was a baseball agent, was not present, was not there, was not in Mexico, was not accompanying him, was actually in the United States the entire time. And so, the theory that allowed this conviction to stand was that a phone call, purportedly, between Mr. Hernandez, the agent, and a handler in the United States, about whether the player's contract would be honored by his team should he come to the United States without waiting for his visa, is enough to support a substantive bringing count, whether principal or even under a dating and a bedding, and it's not. There are lots of cases, hundreds of cases, in fact, in various circuits that we've looked at, we've cited so many of them. I think the Fifth Circuit in the Garcia-Paulin case put it best. They said, we have found no case where a defendant has been convicted under this clause of the statute for bringing an alien to the United States except where the defendant accompanied or arranged to have the alien accompanied as in a smuggling operation across the border into the United States. We clearly don't have that. We don't have assisting. We don't have transporting. Nothing like that. No physical activity. No participation in Mr. Martin's decision to come to the port of entry. So, all we have is... Mr. Marcus, this is Lisa Branch. I have a question for you about your argument on Mr. Martin. We have Martinez and Velasquez who led Martin to the border and coached him on how to get through, and they met him on the other side. And so, if we have Hernandez providing some assistance in that endeavor to get him to the border, how to get across the border, and then meeting him on the other side, why is that not sufficient? Thank you, Your Honor. Good question. Well, first of all, our client, Mr. Hernandez, never spoke with the handlers you mentioned, either Mr. Velasquez or Mr. Martinez. So, he never had direct communication. There was no evidence of that. That wasn't the theory of trial. So, he never provided them with assistance or logistics or even encouragement. The theory was that he talked to another handler, somebody who was in the United States, who then spoke with those two gentlemen. So, that's the first point. So, you don't even have direct communication, which is unusual, right? Because how do you even encourage or cause something to happen when you don't have direct contact? But beyond that— I'm sorry to interrupt. This is Robin Rosenbaum. But just along that same point, it seems like what the district court concluded was that Mr. Lazo, I guess Lazo, Jr., who gave this statement, was a part of the organization, the Lazo Senior Organization, which took over FONACHO, and that there was an agreement among Mr. Hernandez, Mr. Estrada, and that organization to bring aliens into the United States. Obviously, that goes to the conspiracy count. But it also is part of the—I guess it was part of the evidence for the individual bringing counts as well. So, I wanted to give you an opportunity to squarely address that aspect of what the district court relied on. Thank you, Your Honor. Well, look, so, yes, you have the conspiracy. But, again, this is a substantive offense. And even under an aiding and abetting theory, right, there has to be more. You have to have actual conduct that assists the actual physical bringing. This was an odd case because most of the players, in fact, that Mr. Hernandez represented that were an issue in the case did not come into the United States without a visa. Most of them did receive visas. There were a handful of players like Mr. Martin, and we explained the unusual circumstances with his personal safety, which were the factor in why he came. But there wasn't evidence that Mr. Hernandez—so, take Dominguez, which I think obviously is a case you have to look at and distinguish. In Dominguez, that agent, there was evidence of direct involvement with the logistics and the planning. And the key thing that they found for his aiding and abetting conviction under the bringing statute was that he actually financed the smuggling, that he paid in advance $100,000 to the smuggler. And that was what caused the smuggler to go forward. You know, that was the key act. Here, Mr. Hernandez— Mr. Marcos, this is Lisa Branch. Isn't the key factor here the phone call with the Rangers that assured Mr. Martin that the contract would still exist if he went through without a visa? Not in the same direct way, not connected to the bringing. First of all, just factually, Martin had a contract and would have gotten a visa if he decided to wait, right? Now, whether that was a factor to Martin, that may be. That may be part of his calculus, right, was that his contract would be honored. But think about the implications of that argument. First of all, how do you distinguish encouraging or inducing substantively? And by the way, any family member or friend who had a phone call with another relative who said, hey, if relative X comes here, we'll help them. We'll house them. There's a place for them. That kind of conduct, if you look at all the cases out there, is not sufficient to support a bringing charge, which is really talking about the physical transportation, the logistics, the financing of smuggling operations. This was an agent who had a call with someone else, admittedly, let's say a co-conspirator, who then talked to handlers. And then they arranged—they accompanied Mr. Martin to the border. So those are, you know, key facts in distinguishing a co-conspirator. Mr. Martins, I'm sorry. Why isn't it the case, though, that the—I mean, getting back to my question before, the whole operation to bring him in that Mr. Hernandez agreed to under the way the jury decided the case. And, you know, he agreed to it, and they were able to obtain the cooperation of the LASA organization to help Mr. Martin get into the United States by requiring Mr. Martin to give a portion of his—or really a high percentage of his contracts to the LASA organization to get him across the border. I mean, when we consider that Hernandez was involved in that arrangement and created that situation as part of an agreement with them, why isn't that enough, in combination with the other act, to support the conviction on that count? I guess I'm focusing more on the front end here. Right, Your Honor. Well, this is a—I mean, that's a very, very loose association. Association is not enough, right? Two minutes. Two minutes, please. Thank you. So association is insufficient. In our case, Mr. Hernandez is not a member of the smuggling organization. He never got paid by them. That was never the theory. He was an agent. He represented their pliers, and he got an independent fee from the pliers. Once, you know, for their contract. So the fact that there was some sort of symbiotic relationship, if you will, because he's obviously with his partners, getting contracts and getting teams to sign these pliers, and obviously the organization that you mentioned has a financial incentive in that happening. But that can't possibly be enough to support a bringing theory on that theory. Let me ask you this, though. I mean, but for Hernandez and Estrada's involvement, would Martin have been hooked up with the Laza organization? Yes. That was a pretty—yeah, I mean, they would have—remember, these pliers were smuggled to Mexico. Mr. Hernandez comes in after these pliers when they're in, you know, Mexico or other countries to represent them. So he's not— Right. Right. So they would have been, you know, if— But how was Mr. Martin identified to bring to Mexico in the first place, I guess, is the sort of preliminary question. Well, there was not very much evidence of that at trial, Your Honor. These are pliers that are well known. They're top pliers in Cuba. So lots of people in and out of the country know who they are. And these are pliers that want to get out. And so they have family and friends that help them get smuggled from Cuba. And this is one of the issues with the case, right, of course, that even smuggling from Cuba to, let's say, Mexico, is not a crime that could be charged under our statutes. A lot of the evidence in this case concerns that. But the reality is these were pliers that were smuggled to other countries and then trained, you know, to showcase as free agents to come in and play in the U.S., largely with visas. So you have to look at the specific count. I mean, there was no evidence that our client identified Martin. I mean, Martin testified. I never talked to him. Martin didn't even know who Hernandez was. Your time has expired. Your time has expired. I was just going to finish and say that Martin didn't even know who Mr. Hernandez was until he was in Cuba. I mean, into Mexico, when he met him, well after he was smuggled. Thank you, Mr. Marges. And you've reserved four minutes for rebuttal. Yes, I have. All right. Okay. Next, we will hear from the government. Good morning, Your Honors, and may it please the Court, Christopher Smith for the United States. Your Honors, in United States v. Dominguez, this Court addressed at least three issues that largely control the outcome of this case. First, it defined the elements of a Section 1324A2 offense and held that the same jury instruction used below was, quote, a correct statement of the law. Second, it held that evidence that a defendant has organized and financed a smuggling venture is sufficient to sustain an aiding and abetting conviction under the statute. And third, this Court held that the plain language of the statute leaves no doubt that the Cuban Adjustment Act and the Wet Foot, Dry Foot policies are irrelevant to an alien smuggling prosecution. These three Dominguez holdings foreclose most of the defendant's arguments. Your Honors... Mr. Smith? Yes, Your Honor. Mr. Smith, this is Robin Rosenbaum. I'd like to take you to start, if you don't mind, with count number two, the Martin count against Mr. Hernandez. And I'd like you to address Mr. Marcus' argument that the events that occurred prior to Mr. Martin's crossing of the border were just association events and were not enough in association with the phone call to establish substantive count of bringing. Well, Your Honor, I'd start with the elements of aiding and abetting as this Court defined them in Dominguez, which are basically three. One, that the substantive offense was committed by someone. Two, that the defendant committed an act which contributed to and furthered the offense. And three, the defendant intended to aid in its commission. So even putting aside the evidence that goes even further back about Mr. Martin, that he was smuggled by the LAZO organization to Mexico, that there were troubles getting his visa to the United States, which ended in Mr. Hernandez taking a trip to Guatemala to try and get a visa for him, which again shows the interest that the organization took in having this individual be able to come to the United States to play baseball. You have a situation where they are in Monterey, where Mr. Martin is in Monterey with his handlers Velazquez and Martinez. He has a contract at that point with the Texas Rangers for something in excess of $15 million. And the testimony that Mr. Martin himself gave was that they needed to confirm with Bart Hernandez that he would be able to maintain that contract if he crossed the border illegally without a visa at that juncture. And then there's the additional testimony that Mr. Lazo Jr. gave overhearing this conversation that occurred at Lazo's house that the testimony differs with regard to whether Martin was on the phone call or not. But again, under the Jackson V Virginia standard, we look at the facts most favorable to the government. And what those show here is that there was a call between the handlers Martin Hernandez and others where basically Lazo says on this call, look, whether he crosses or not is a decision that needs to be made by Bart Hernandez and Martin's father. And the testimony further establishes that through whatever actions Mr. Hernandez took to check on the validity of the contract, he got back to the group and said, yeah, the contract will be valid if he crosses. And that was the triggering event because the group at that point knew that they would get paid. Again, 30% and 5% of that $15 million contract is a lot of money. So just again, turning back to the aiding and abetting elements, that certainly is an act which contributed to and furthered the offense, assuming that the whole group would get, assuring that the whole group would get paid for it. And Mr. Hernandez intended to aid in this commission that totality of the circumstances indicate that. So in the government's view, Your Honor, that well exceeds the Jackson v. Virginia standard for a sufficiency claim and is in a lot of respects analogous to what the court discussed in Dominguez. But Your Honor, what would you say in response to the defendant's argument that no one actually committed an act or that the substantive offense was not committed by anyone because a substantive offense requires the actual physical bringing through the court of entry? Well, Your Honor, I appreciate the question. And the alien can't be the person who committed the offense. Yes, Your Honor. And that's a point that I wanted to make because for all four of the substantive counts, there is an individual who engaged in that physical conveyance. With respect to Mr. Martin, it was Mr. Martinez, who I believe shows, the evidence shows that Mr. Martinez and Mr. Martin took a bus from Monterey to the border. I believe it was Nuevo Laredo, if I recall, and that they crossed in close proximity to each other, and then they basically fly together to Miami. Likewise, Omar Luis, I will take as another example account that pertains to Mr. Hernandez. Mr. Hernandez flew with Omar Luis from Panama through Cancun to Reynosa, Mexico. And again, the testimony differs in Reynosa at the border, whether they took the cab together to the border or not. But what the evidence is quite clear about, and again, Jackson v. Virginia, light and most favorable to the government, what the evidence is quite clear about is that they crossed in very close proximity to each other, Mr. Estrada and Mr. Luis. And then they take a cab together from McAllen to Houston, and they fly on from there. So Mr. Smith, just to make sure I'm understanding your argument, your argument is not that no one had to actually accompany him, right? Your argument is that someone did accompany him, it just was not exactly with him. Am I understanding your argument correctly? Your Honor, I think that that's a correct statement of the argument. I mean, again, I think the evidence is that they were more or less with each other. They may not have been with each other at the second he entered the inspection station, but they were there contemporaneously. So let me ask you this then. If we find that it's not enough if they were in the same general vicinity, but did not actually walk him through, then is there a problem with the first element of aiding and abetting that a substance of offense was committed by someone? Well, Your Honor, first of all, I may have misspoken just a moment ago that Omar Luis Count had to do with Mr. Estrada, not Mr. Hernandez. I apologize with that. I do think that there had to have been somebody who physically brought or conveyed the individual across the border. I mean, I think that the evidence is with regard to Mr. Martinez, with regard to Mr. Luis, that evidence was that it was Mr. Estrada. And yes, I mean, I think that you can't aid and abet an offense which doesn't exist, but I think the evidence is very strong here that the offense itself does exist. Go ahead. Go ahead. Oh, no, no, go ahead. No, no, that's fine. Mr. Smith, are you making any difference? You've been talking about the land port of entry. Does the analysis change for those who were transiting through the Miami Airport? Well, Your Honor, if you're referring to Mr. Abreu and Mr. Hinojosa, I think that those instances share a lot of the same similarity. Those individuals were physically brought by the smuggling organization from Cuba to Haiti at that point, where they were housed and fed at the expense of the smuggling organization. And when it came time for them to cross to come into the United States, the evidence viewed in the light most favorable to the government showed that Mr. Estrada paid Mr. Latouf, I mean Latouf, in Haiti to procure documents for these individuals to have an individual meet them and guide them through the airport in Port-au-Prince. I believe that the evidence put in a trial discusses this man named Roger, who the players say when they were going through the security checkpoints and the immigration checkpoints, Roger was in control and guided them all the way through on to the basically up to the point of the plane. And then at the other end of that, in Miami, Mr. Estrada and Mr. Hernandez were there to travel with Mr. Abreu, for example, to Chicago to go sign the contract. So basically, it's no different in my view, taking these individuals up through the immigration checkpoints, through the security checkpoints in the airport, and putting them on a direct flight to the United States and meeting them on the other end. That functionally is the same as taking them up to the land border, watching them cross and then meeting them on the other side, because as your honors know, in multiple contexts, Fourth Amendment, primarily the case law makes very clear that an international airport is the functional equivalent of the border. And I think that that analogy is one that is apt here. Mr. Smith, this is Jill Pryor. Go ahead, Judge Branch. This is just following up on the international airport thing. You cite Melina Gomez for the proposition that international airports are the functional equivalent of U.S. borders, but those – in that case, it was an airport in Puerto Rico. Here, we're dealing with an airport in Haiti. It is an international airport outside of a U.S. territory. Is that distinction relevant to this analysis? Your Honor, in this particular factual scenario, I don't think so. I think that that's the equivalent of walking an individual up to the border in Nuevo Laredo right to the bridge and basically having them cross at that point. It's the same thing as walking somebody up to the gate in an international airport. I mean, just to go back to the analogy that was used a little earlier by opposing counsel in the argument about – Counsel, counsel, counsel, I'm sorry. You dropped out for about the last 30 seconds, so you might need to restate whatever you were stating. And, Stephanie, could you please add those 30 seconds back? Oh, I apologize, Your Honor. So, going back to the point that I was making, I do believe that it doesn't matter. Here, the distinction is not on these particular facts because taking somebody at an international airport directly to the departure gate would be the same as walking them up to the bridge in Nuevo Laredo, walking them up to the precipice of the border and watching them cross. I think that the analogy that was used by my friends on the other side during their argument about basically taking one's mother to the doctor, and would you say that you brought her there if you simply paid cab fare for it? Maybe not, but if you traveled with her to the doctor's office, walked into the lower level of the doctor's office, and put her on the elevator to the doctor's floor, I think at that point you'd say you took her to the doctor, and that's basically what happened here because they brought these individuals. Mr. Knapp? Yes, Your Honor. This is Robin Rosenthal. What is the rule that you would articulate, then, for the conduct that you see that qualifies as bringing a person into the United States? If you had to wrap it up into a nice little neat rule, what would that be? I think you've got to physically convey the person to the border or the functional equivalent thereof. I think that the cases, that would be consistent with all of the case law, Your Honor, and that is true for every one of these counts. Mr. Martinez takes Mr. Martin to Reynosa from Monterey.  Yes, Your Honor. I'm sorry. Please drop that again for a second, but when you answer the question, can you say, you said you must physically convey the person to the border or the functional equivalent of the border, but that in and of itself is not enough, right? I mean, you have to bring the person to the United States, so there must be another part to the rule that you would articulate. What would be that other part? Well, I don't know that I agree, Your Honor, that that is not enough, but I would look at, you know, assuming for a moment that the premise of Your Honor's question, I'd look, for example, to the Ninth Circuit's case in Singh, which was decided under Plain Air, but the Ninth Circuit has subsequently used it as an example of things that are, survive sufficiency challenges under Lopez, and there basically there was communication between the smugglers and the individual on the U.S. side. The individual on the U.S. side, when the person crossed, they then flew from Seattle to New York and then back to return the passport book to the smuggling organization. So I think if there, the case law indicates if there needs to be something more, I do think it's fulfilled by some of these actions in the totality of the circumstance on the back end, basically, that you brought the person to the border, that person crosses, you're there on the other side and basically facilitate what they came to the United States for at that point. And here in every one of these instances, there is that physical conveyance to the border. Mr. Estrada crosses with, around the same time as Mr. Luis, and then picks him up on the other side and takes him. Mr. Martinez crosses around the same time as Mr. Martin and gets him on the other side. I mean, to accept the defendants, what I think the defendants propose is their rule, it's that the statute is not fulfilled unless the individuals walk across the border, you know, themselves either at action together or across the international boundary exactly at the same time. And I think that's just plainly not correct because among other things, which goes to the court of entry point that opposing counsel raised in their argument, this court in Dominguez discussed the legislative history of Section 1324A2. Basically, Congress, when it enacted the statute, intended to expand the scope of criminal liability to overrule this court's prior decision in Zayas-Morales. Now, what had happened in Zayas-Morales, as your honors well know, is that during the Muriel boat lift, vessel operators transported Cuban migrants from Cuba to a port of entry at Key West. And this court held under the existing version of the statute, then the evidence did not support the conviction in that circumstance. And that's when Congress enacted the current version of the statute, amended it to make clear that the scope of liability is expanded to encompass all sorts of situations where you've brought somebody who you know or believe does not have prior official authorization to the United States. So if I'm understanding you correctly, the test that you are arguing in favor of is that there is a facilitation of bringing the person to the border and then there is a facilitation immediately on the other side of assisting the person in accomplishing their goals once they're inside the United States? Is that what you're saying the test is? I'm just trying to figure out what your test is. Your honor, I think in the government's view, I think physically conveying somebody to the border and then you've taken them to right where they need to be on the border and then with the purpose of that person entering or coming to the United States and they cross, I think in the government's view, the elements are satisfied at that point. The additional evidence on the background, I think, sorry, on the back end, I think is I'm drawing the analogy in seeing the Ninth Circuit's case in seeing, for example, where again the Ninth Circuit basically discusses how this is, there are various unique situations that happen in these cases and that can be additional evidence that's relevant to sustaining the conviction. So I think in the government's view, I wouldn't go so far as to say that that's required, but it's something that we certainly have here in this particular case. Mr. Smith, this is Jill Pryor. If that's your test, then it seems to me that simply giving someone a ride to the border would be sufficient. Well, Your Honor, if one is doing it so that person crosses, if you're taking somebody to the border so that person crosses and you're doing so knowing that they don't have prior authorization to enter the United States, I mean that's not, there could be permutations of that that could fulfill the statute, but obviously there is much more here. And I think really the right approach is... We're asking what is the rule that you are coming, because on the one hand you said earlier when you were speaking that it wouldn't be enough just to bring the person to the border. Somebody has to actually bring them across, if I understood you, at the beginning of your argument. But now I hear you to be saying it's enough to just bring them right where they need to be and then they cross. But then who would be committing the substantive offense? I'm a little confused as to what the rule you're advocating for is. And it's probably just, you know, because of a phone situation dropping in and out, but I apologize, but I need to ask you to state it one more time, what your rule would be. Yes, Your Honor, so I mean I go to the elements of the statute. Any person who knowingly or in reckless disregard of the fact that an alien has not received official authorization brings to or attempts to bring them to the United States. So I look to what brings to means, brings to the United States. And I think when you physically convey somebody to the border, and especially in situations where you physically cross with them or contemporaneously with them, you have brought them to the United States. And the statute says bring to, not bring into, so that doesn't necessarily encompass the entry element there. But when you bring that individual to the border and that individual crosses, you brought in, and it may be highly factually dependent, Your Honor, as the Ninth Circuit explained in seeing, and as many of these cases indicate, that ultimately it's going to be sort of a totality of the circumstance as to whether that is fulfilled. But here you have in every single one of these instances, especially with Luis and especially with Martine, you have an individual who accompanies, takes them to the border, they cross, and they're met directly on the other side. So the government's position is that that's at the core of the statute, Your Honor, because the only alternative that would not cover that is if it were actually required that they contemporaneously walk together up to the inspection station or contemporaneously walk together across the borderline. I think any version of bring to is encompassed with that. And, Your Honor, in the government's views, those counts are quite strong, but I would also just as a point to bring up here add that this, again, was a multi-object conspiracy. So if for whatever reason the court were to find that the evidence was not sufficient to sustain the bringing to count, if the evidence was sufficient to sustain any three of the other objects of the conspiracy, then that conspiracy conviction would still stand as well. So I would just point that out in the alternative, Your Honors. Mr. Smith, this is Jill Pryor. I'd like to ask you about Mr. Srebnick's argument that Dominguez is distinguishable because in this case the players were brought to points of entry where it was presumptive that they would be paroled into the United States. What's your response to that? Well, Your Honor, I think both the statute, Dominguez, and the history indicate that that doesn't matter. I'd look to three basic points. First, as I was explaining before or noting before, the statute refers to bring to the United States, not bring into the United States. So by the time you get to the inspection station there where they adjudicate your parole or whatever happens after the fact, you've already been brought to the United States at that point. Second, just in the overall statutory scheme, Section 1324A2B3 makes it a greater offense to bring somebody to something other than a court of entry, basically. If you bring them to the United States and not be immediately inspected, that to me suggests the rest of the statute does cover the fact that for individuals who are brought to a court of entry. And then third, this court in Dominguez discussed the history of 1324A2, the current version, in the opinion. And I think the history makes pretty clear that it's meant to cover these instances because in Zayas Morales, the whole issue in that case was basically that the Cuban migrants in the Muriel boat lift had been transported to a port of entry, and this court found that the evidence wasn't sufficient to sustain the conviction under that version of the statute. And then Congress expanded the scope of the statute to include, to leave no doubt that these instances are included. Just coming up to... Right now, Mr. Smith, I'm asking about the prior authorization point rather than bringing to. Yes, Your Honor. I think his argument was that there's prior authorization when the person is brought to the port of entry because it's presumptive that they'll be paroled into the United States. It's a foregone conclusion, he said. Well, Your Honor, I don't think it is a foregone conclusion. I think that the language used in Mr. Estrada's brief is de facto automatic parole. And I think just as an initial matter, de facto automatic parole is not prior official authorization.  Because the court in Dominguez appointed, specifically acquitted parole to being an official action which may later be taken with respect to some alien. And that's the language in Section 1324A2 that I think Congress makes expressly clear that any action which may be later taken with respect to such alien is not prior official authorization. And that's what this court in Dominguez acquitted parole to. And when individuals arrive at the Cuban migrants, arrive at the inspection station, when they arrive there they have no right to enter the United States. They have to be inspected at that point. And if the factors for parole, which may weigh heavily in favor of parole in the prior iterations of U.S. policy under wet foot, dry foot, they may be paroled into the country, but they may not. And that's, I think, very different than the type of prior official authorization that Congress was concerned with, which is things that are actually lawful authorization like visas. Counsel, two minutes. Your Honors, I am happy to answer any further questions you have, but I think that the issues also in the government's view are well laid out in our brief. So I'm also happy to conclude if the court has no further questions. Well, Your Honors, I thank you very much for your time. And I would ask that the court affirm the convictions of both Mr. Estrada and Mr. Hernandez. Thank you, Your Honors. Thank you, Counsel. All right, we'll hear again from Mr. Srebnik. Mr. Srebnik, why don't you... Your Honors, this is Howard Srebnik on behalf of Julio Estrada. I'd like to point the court to... Why isn't... Thank you, Mr. Srebnik. Why isn't there a difference between the 1182... Well, the 1182 bases, the Visa Waiver Program, for example, and the Cuban Adjustment Act and the Wet Foot Dry Foot Policy? Why isn't there a difference between those two? Because it seems like the Visa Program is governed statutorily by Section 1187, 8 U.S.C. 1187, and you either do or do not meet those statutory requirements. Your client does not meet those statutory requirements. But the Wet Foot Dry Foot Policy is an exercise of the Attorney General's authority under 1182 D5A to grant discretionary parole into the United States temporarily on a case-by-case basis for urgent humanitarian reasons or significant public benefit. So why isn't there a difference between those two different ways that a person can get in that makes a substantive difference for the purposes that you are arguing? Because the issuance of a visa does not necessarily guarantee an alien entry into the United States. They still have to be inspected, and CPP can turn away someone who has a visa. So the government is conflating the visa with a grant of authority to actually enter the United States. It is not. Indeed, the government's own expert, Mr. Baer, has conceded as much that the issuance of a visa does not guarantee admission into the United States. True. But I'm talking about the Visa Waiver Program, which it seems to me like you were sort of analogizing to. Right. So our point was with regard to the denial of our jury instruction and the pre-permitting of evidence, if an alien from a country that has the Visa Waiver Program in place was accused of having been brought into the United States, surely the defense could offer evidence of the Visa Waiver Program so that the jury could decide whether the defendant committed the crime of bringing that alien into the U.S. No different, we submit, where a Cuban is the alien who is, quote, brought into or brought to the United States if we accept the government's definition. So too should the defendant who allegedly smuggles the Cuban directly to a port of entry. That defendant should likewise be permitted to explain to the jury that the executive branch has granted two Cubans a special different status, and the exclusion of that evidence and the directing of the verdict on that we believe constitutes error and infects all of the counts of conviction. If I could just have one minute, or not even 30 seconds, to address the bring-to issue, having coped unclear on the jury instruction issue, but let me stay with the jury instruction issue. Even though the Dominguez case approved the instructions there, that is not an answer since the defendants there did not necessarily challenge the conflation of the elements. In the Takaloff case, the government made the same argument that the pattern jury instruction had been approved for decades and still the 11th Circuit reversed for failure of the district court to have made the offer given the jury instructions requested. And given the Torres-Cobus case, I understand it's an unpublished opinion, I have 10 seconds, that's a case where three judges in this court said that the defense reading of this statute is facially plausible over the government's objection. I see that my time is up. Thank you, your honors. No, you still have a minute. Oh, thank you. I thought my time was up, my clock was wrong then. No, we wait until after the judge. Thank you. So, on the issue of the bring to under the government's theory, there are many people at NASA that could take credit for bringing Neil Armstrong to the moon for having launched him there, and yet the 5th Circuit and the D.C. District Court reject this theory that by sending someone somewhere, that is tantamount to bringing someone somewhere. And the prosecutor was trying to use the example that I did offer the court about bringing my mother or grandmother to the doctor. If I simply left her at the door of the building and did not take her to the doctor's office, I think the court would say it's not enough to take credit for bringing my mother to the doctor if all I do is serve as the Uber driver, leaving her at the street level. So, Mr. Kravnik, what is the rule that you would propose? Exactly what the 5th Circuit has held. There has to be direct accompaniment. There has to be a direct escort into the United States. It's not enough for someone to drive an alien to the Mexico side of the border, and the alien, under his own power, walks across the border, presents himself to the port of entry. It's not enough to drive someone to the airport in Haiti and even pay for their plane ticket. What about picking up on the other side? Thank you, Stephanie. You can go ahead and answer. What about picking them up on the other side? Yes, that likewise does not satisfy the bring-to part of the case, particularly since on the other side, these aliens are already lawfully admitted into the United States by virtue of parole. Yes, the question is, what if you're doing both? You're bringing two, or you're taking them up there, and then you're meeting them on the other side. Why isn't that enough? If it's through a designated port of entry, it's not enough, because the alien at that point is already lawfully in the United States. In the cases that the government cites, all of those cases are where the alien were smuggled outside of the port of entry and were not lawfully in the United States. Doesn't that sort of make the bring-to statute, I guess, doesn't it take all of its teeth out? I mean, if there was a giant loophole, right, if there's this giant loophole that you can take them all the way up to the border and then meet them on the other side, and you're not bringing two, I mean, what is left? They're guilty under the government's theory of encouraging and inducing the alien to enter the United States. But what is left of the bring-to statute? Bring-to is the classic case of driving someone across the border, particularly not through a designated port of entry. It would be flying the plane with an alien and having them land at Opelok Airport without any, basically flying them into the United States, using a boat to land them on the shores of Key Largo. Right. So then I guess the question is, under your view of it, then bring-to as a practical matter would pretty much only ever apply outside of designated ports of entry as a practical matter. As a practical matter, that would be the paradigm case, yes, Your Honor. Although we could certainly envision a case where a pilot loads up aliens, flies them into Miami International Airport, and has physically brought them to the United States under that scenario. But he's not accompanying them through the border, so how does that satisfy your definition? I mean, he's not going to walk them through. It may not, but it's certainly the other crimes that I've described that are codified. Okay. Thank you very much, Mr. Srebnick. Thank you. Thank you, Your Honor. I want to pick up on the bringing discussion and also address the port of entry situation, because I think it is unique and raises complications with respect to both bringing and also prior authorization. But I think the government's position in this case, there's no distinction at all between encouraging and inducing someone to come into the U.S. and bringing them. If a phone call of encouragement, which is really the differentiating factor on count two with respect to Mr. Hernandez, couldn't be enough to satisfy a bringing where the alien in question wasn't even physically accompanied across the border by anyone. That is a problem. Obviously, you're going to have cases where you can encourage and bring, but simply encouraging in and of itself without the bringing, without the logistics or even the financing, that can't possibly be enough. Otherwise, you would be reading away that statute under the government's theory in this case. With respect to Mr. Hernandez, he was acquitted by the court on Rule 29 on the airport, because the loose association, the fact that he was the agent, that he negotiated contracts, that there was a financial symbiosis between him and the smuggling organization, wasn't enough because he wasn't involved in the actual bringing, either physically or financing. Dominguez, there is language about the financing in that case. But Hernandez, of course, in our case with respect to count two, doesn't pay for any of the trip. The government talked about things happening on the back end. Mr. Hernandez was in Miami. He wasn't at the border. He wasn't in a car waiting for Mr. Martin outside the port of entry after he had been paroled into the country. There's none of that conduct that can support the government's theory. And I think the questions raised point to the differences between typical smuggling cases where people are brought into the country, irregularly, not at the port of entry and this case. And beyond that, the questions that this court has raised about prior authorization are important as well, because these are Cubans who had special status at the time. And this is important because this is why Dominguez is different. Dominguez simply said under the Cuban Adjustment Act, that because you get paroled after the fact, that doesn't provide you with the prior official authorization to enter. This case, though, is very different, right? Here you have Mr. Martin coming on the land bridge, right, at the time. There was executive branch policy, you know, through CBP that if you were Cuban and presented yourself and you weren't. Yes. I'm sorry. You dropped out for about 30 seconds there. Stephanie, can you give him 30 more seconds? And can you repeat what you said about after? I think the last thing I caught was that these are Cubans that had special status at the time and then you dropped out. Yes, Your Honor. Thank you. So Dominguez addressed the fact that the finding in the split panel was that the Cuban Adjustment Act may provide you with after the fact, the after facts ability to be paroled and stay here, but it doesn't give you the prior authorization to enter the country. And then Dominguez didn't go to a port of entry and ask to come in. They came in irregularly. In this case, that didn't happen. Mr. Martin came on the land bridge from Mexico and presented himself at the border. He could have been turned away, but there was a policy in place that allowed Cubans who didn't have criminal records, who were Cuban citizens, to enter the port of entry and claim asylum and then have their adjudication. We actually, and I encourage the court to look at it, we actually made an ex parte proffer in Docket Entry 258, that we wanted to be able to introduce evidence of this policy by the executive branch, but it was not considered in Dominguez. Because our point is that at that point, just like because of the policies with respect to Cuba at the time, and by the way, under the Obama administration, that policy changed. You can see the clear difference. If Mr. Martin showed up today on that land bridge, he'd be turned away. He wouldn't be allowed permission to enter. And so the problem with the government's argument is that they foreclosed the ability for us to show that there was authorization at the checkpoint to enter. And so it was lawful. So that's. I'm sorry. Was there a question? I couldn't hear. Oh, thank you. Okay. Thank you counsel. I think we have your argument. Thank you.